**FIFTH DIVISION**
**MERCIER, C. J.,**
**MCFADDEN, P. J., and RICKMAN, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**May 6, 2024**

# In the Court of Appeals of Georgia

A24A0268, A24A0280. PNC FINANCIAL SERVICES GROUP,
    INC. v. GIBSON; and vice versa.

McFADDEN, Presiding Judge.

These appeals concern two orders entered in John Gibson's lawsuit against

PNC Financial Services Group, Inc. In one order, the trial court granted PNC's

motion to dismiss Gibson's defamation claim under Georgia's anti-Strategic Lawsuits

Against Public Participation ("anti-SLAPP") statute, OCGA § 9-11-11.1, but denied

PNC's request for attorney fees under the statute. In the other order, the trial court

ordered PNC to produce certain documents to Gibson. PNC had argued that the

documents were protected by the attorney-client privilege, but the trial court held that

a fiduciary duty exception to the privilege required their disclosure.

In Case No. A24A0268, PNC appeals the denial of its request for attorney fees and the order requiring it to produce documents. We hold that the award of attorney fees was mandatory under the anti-SLAPP statute.

As to document production, Gibson's claim that PNC must turn over to him documents protected by the attorney-client privilege rests on his contention that PNC owes him fiduciary duties. We reject that contention. We hold that, because Gibson's individual retirement account ("IRA") was self directed, no fiduciary duty arose; and consequently we reject Gibson's claim to documents protected by the attorney-client privilege.

We reverse the trial court's contrary rulings and remand for the trial court to enter an award of attorney fees.

In Case No. A24A0280, Gibson appeals the grant of PNC's anti-SLAPP motion. We affirm that ruling.

1. *Background*

"We generally review a trial court's ruling on an anti-SLAPP motion to strike de novo, viewing the pleadings and affidavits submitted by the parties in the light most favorable to the plaintiff (as the non-moving party)." *ACLU v. Zeh*, 312 Ga. 647, 652

(1) (c) (864 SE2d 422) (2021) (citation omitted). We review a trial court's decision on discovery matters for a clear abuse of discretion. See *Hill, Kertscher & Wharton v. Moody*, 308 Ga. 74, 80 (2) (839 SE2d 535) (2020).

So viewed, the record shows that PNC was the custodian of Gibson's self-directed IRA. In relation to the investigation of an investment fund, the Securities and Exchange Commission ("SEC") subpoenaed PNC to produce records regarding a particular transaction of Gibson's. Gibson consented to PNC responding to the subpoena. But, according to Gibson, PNC did not respond accurately.

Gibson sued PNC. In his first amended complaint, he asserted claims for conversion of his financial records, breach of a bailment agreement, and breach of fiduciary duty. He alleged that PNC's breach of fiduciary duty subjected him "to false and defamatory allegations against him by the Securities and Exchange Commission that have been publicly disclosed on the SEC web site."

After PNC deposed Gibson — where he testified that he was claiming in his lawsuit that, in response to the subpoena, PNC made false statements to the SEC that had caused him reputational harm — PNC filed a motion to dismiss Gibson's claims

that PNC is liable for reputational harm. It based its motion on Georgia's anti-SLAPP statute, OCGA § 9-11-11.1. It sought attorney fees under section (b.1) of the statute.

About three weeks later, Gibson amended his complaint and, among other things, removed the reference to "defamatory allegations." But he still alleged that PNC's breach of its fiduciary duty subjected him to "false allegations . . . publicly disclosed on the SEC website."

After a hearing, the trial court granted PNC's anti-SLAPP motion, specifying that he was "dismiss[ing] the challenged defamation claim only, including tort damages arising from reputational harm." The court denied PNC's request for attorney fees under OCGA § 9-11-11.1 (b.1) because Gibson's "remaining claims are not subject to PNC's [a]nti-SLAPP Motion, and, thus survive."

The same day, the court entered an order requiring PNC to produce certain documents that PNC contended were protected by the attorney-client privilege. The court based the order on a fiduciary duty exception to the attorney-client privilege. PNC filed this appeal, and Gibson filed a cross-appeal.

2. *Anti-SLAPP*

We first address the anti-SLAPP issues. We hold that the trial court did not err in granting the anti-SLAPP motion, but it did err in denying PNC's request for attorney fees.

(a) *Applicable law*

Regarding dismissing a claim under the anti-SLAPP statute, the statute protects free speech. It provides:

> A claim for relief against a person or entity arising from any act of such person or entity which could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern shall be subject to a motion to strike unless the court determines that the nonmoving party has established that there is a probability that the nonmoving party will prevail on the claim.

OCGA § 9-11-11.1 (b) (1). The statutory text

> makes clear that the analysis of an anti-SLAPP motion to strike involves two steps. First, the court must decide whether the party filing the anti-SLAPP motion . . . has made a threshold showing that the challenged claim is one arising from protected activity. If so, the court must decide whether the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

*ACLU*, 312 Ga. at 650 (1) (a).

(b) *Parties' arguments*

(i) *Gibson*

Gibson enumerates that the trial court erred in granting PNC's anti-SLAPP motion because the motion was untimely and was filed for the purpose of delay. He also enumerates that the motion meets none of the requirements of OCGA § 9-11-11.1 and that PNC's alleged defamatory acts do not fall within the protection of the anti-SLAPP statute. (Gibson also enumerates that *if* the trial court excluded any damages from an alleged conflict of interest or breach of fiduciary duties, the court erred. He has not shown error. The trial court explicitly limited its dismissal order to defamation claims.)

(A) *Delay and timeliness*

Gibson argues that the trial court erred by granting the anti-SLAPP motion because it was untimely and its timing demonstrates that PNC filed it for the purpose of delay. We disagree.

Initially, we note that OCGA 9-11-11.1 does not provide that delay is a ground for denying an anti-SLAPP motion. The only mention of delay in the anti-SLAPP

6

statute is in the attorney fees provision. See OCGA § 9-11-11.1 (b.1) ("If the court finds that a motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award attorney's fees and expenses of litigation to the nonmoving party prevailing on the motion for the attorney's fees and expenses of litigation associated with the motion in an amount to be determined by the court based on the facts and circumstances of the case."). And Gibson cites no authority in support of his argument that an anti-SLAPP motion may be denied solely because of delay.

In any event, PNC filed the anti-SLAPP motion less than four months after the taking of Gibson's deposition in which he announced for the first time that he was claiming reputational harm because of PNC's statements to the SEC. (Although he had included in his first amended complaint a reference to the SEC making "false and defamatory allegations against him" due to PNC's breach of fiduciary duty, Gibson had not claimed until his deposition that PNC's actions harmed his reputation for integrity. ) Gibson has not shown that the trial court erred by failing to deny the anti-SLAPP motion because of delay.

Gibson also argues that PNC's anti-SLAPP motion was actually a motion to strike, since OCGA § 9-11-11.1 refers to such motions as motions to strike. See OCGA § 9-11-11.1 (b) (1). So, he argues, PNC had to file its motion within 30 days after service of the pleadings under OCGA § 9-11-12 (f) ("Upon motion made by a party within 30 days after the service of the pleading upon him . . . the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."). Gibson did not raise this statutory argument in the trial court, and so has not preserved it for review on appeal. *Rodriguez v. State Farm Mut. Automobile Ins. Co.*, 366 Ga. App. 65, 70 (880 SE2d 606) (2022).

(B) *Two-step analysis*

Gibson argues that the anti-SLAPP motion meets none of the requirements of the statute. Relatedly, he argues that PNC's allegedly defamatory acts do not fall within the protection of the anti-SLAPP statute. We disagree.

As detailed above, the analysis of an anti-SLAPP motion involves two steps: first determining whether the party filing the anti-SLAPP motion has made a threshold showing that the challenged claim is one arising from protected activity and then

8

deciding whether the proponent of the challenged claim has established that there is a probability that he will prevail on the claim. *ACLU*, 312 Ga. at 650 (1) (a).

(1) *First step*

Gibson argues that PNC's conduct that forms the basis of his claim cannot reasonably be construed as acts in furtherance of PNC's right of free speech and therefore is not protected activity. We disagree.

OCGA § 9-11-11.1 (c) defines the relevant term used in subsection (b) (1) — "act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern" — to include:

> Any written or oral statement or writing or petition made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;

> Any written or oral statement or writing or petition made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law[.]

OCGA § 9-11-11.1 (c) (1), (2). "OCGA § 9-11-11.1 (c) creates an expansive definition of protected speech that includes any statement made to any official proceeding

authorized by law or any statement made in connection with an issue under consideration by any official proceeding." *Johnson v. Cordtz*, 366 Ga. App. 87, 91 (1) (878 SE2d 603) (2022).

Gibson's complaints center on what PNC said and did not say to the SEC in response to its subpoena. The SEC issued the subpoena pursuant to a "formal order of investigation [under t]he authority [of] Section 20 (a) of the Securities Act; Section 21 (a) of the Securities and Exchange Act; and Section 209 (a) of the Investment Advisers Act." We hold that this investigation was an official proceeding authorized by law. So the alleged defamatory statements and omissions from PNC to the SEC relate to an official proceeding authorized by law and thus concern protected activity. *Johnson*, 366 Ga. App. at 91 (1).

(2) *Second step*

Gibson undertakes to flip the evidentiary burden on the second step of the analysis, arguing that PNC has not shown that he will not prevail. But the burden was on him, and "[t]o meet this burden, [he was] required to demonstrate that [his] claims are both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if [his] evidence is credited." *Wilkes & McHugh, P.A.*

*v. LTC Consulting*, 306 Ga. 252, 264 (4) (830 SE2d 119) (2019). He has not made this showing.

As noted, the trial court dismissed "the challenged defamation claim only, including tort damages from reputational harm." And although Gibson couches his claim in the language of breaches of fiduciary and trustee duties, "[t]he legal remedy where one is allegedly injured by words published to a third person is an action for defamation." *Tucker v. News Publishing Co.*, 197 Ga. App. 85, 87 (2) (397 SE2d 499) (1990) (citation and punctuation omitted).

Defamation claims are governed by a one-year statute of limitation. See *Garcia v. Shaw Indus.*, 321 Ga. App. 48, 54 (2) (741 SE2d 285) (2013). See also OCGA § 9-3-33 ("actions . . . for injuries to the reputation . . . shall be brought within one year after the right of action accrues"). Gibson did not file his original complaint until August 2017, more than a year after the last allegedly false statement. Because his defamation claim is time barred, Gibson has not met his burden of showing that his claim is legally sufficient to sustain a judgment in his favor.

Gibson has not shown that the trial court erred in granting PNC's anti-SLAPP motion, and we affirm that ruling.

(ii) *PNC*

PNC argues that the trial court erred by denying its motion for attorney fees because OCGA § 9-11-11.1 (b.1) mandates them since its anti-SLAPP motion was successful. We agree.

Section (b.1) of the anti-SLAPP statute provides, "[A] prevailing moving party on a motion to strike shall be granted the recovery of attorney's fees and expenses of litigation related to the action in an amount to be determined by the court based on the facts and circumstances of the case." OCGA § 9-11-11.1 (b.1). "It can scarcely be doubted that by the use of the word 'shall' a legislative mandate, and not a mere permission, was imported into the enforcement provisions of the Act at OCGA § 9-11-11.1 (b)." *Hagemann v. Berkman Wynhaven Assoc.*, 290 Ga. App. 677, 683 (660 SE2d 449) (2008) (citation and punctuation omitted). Because PNC prevailed on its anti-SLAPP motion, it is entitled to attorney fees under OCGA § 9-11-11.1 (b.1). We reverse the portion of the trial court's anti-SLAPP order that denied PNC's request for attorney fees on its successful anti-SLAPP motion, and we remand for the trial court to enter an award of attorney fees "based on the facts and circumstances of the case." OCGA § 9-11-11.1 (b.1).

3. *Motion to compel*

PNC argues that the trial court erred by ordering PNC to produce its attorney-client privileged communications on the basis of a fiduciary duty exception to the privilege. Such an exception, which has apparently not been adopted in Georgia, "holds that one who is acting in a fiduciary capacity cannot assert privilege to shield its communications with counsel from the beneficiary of the fiduciary relationship." *St. Simons Waterfront v. Hunter, Maclean, Exley & Dunn*, 293 Ga. 419, 427-428 (1) (4) (746 SE2d 98) (2013) (declining to adopt fiduciary duty exception to attorney-client privilege in the context of an attorney working as in-house counsel for his law firm, which was being sued for legal malpractice by a former client, the beneficiary of the fiduciary relationship).

PNC argues that we need not reach the difficult question of whether such an exception exists in Georgia in the circumstances of this case, because PNC did not owe a fiduciary duty to Gibson. We agree.

"A relationship that gives rise to a fiduciary duty exists either when a party exercises a controlling influence over the will, conduct, and interest of another or when, from a similar relationship of mutual confidence, the law requires the utmost

good faith." *Bush v. Liberty Mut. Ins. Co.*, 361 Ga. App. 475, 479 (1) (864 SE2d 657) (2021) (citations and punctuation omitted). However, "[t]he mere fact that one reposes trust and confidence in another does not create a confidential relationship. In the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone." *Lewis v. Alderman*, 117 Ga. App. 855 (1) (162 SE2d 440) (1968) (citation and punctuation omitted).

A fiduciary "relationship may be created by law, contract, or the facts of a particular case." *Douglas v. Bigley*, 278 Ga. App. 117, 120 (1) (a) (628 SE2d 199) (2006). "The party asserting the existence of a confidential relationship has the burden of establishing its existence." *Canales v. Wilson Southland Ins. Agency*, 261 Ga. App. 529, 531 (1) (583 SE2d 203) (2003). (As detailed in the margin, our Supreme Court has explained that fiduciary relationships are a subset of confidential relationships.[1])

---

[1] Our Supreme Court recently clarified that "while all fiduciary relationships are confidential in nature, only some confidential relationships are fiduciary relationships." *King v. King*, 316 Ga. 354, 357 (2) (888 SE2d 166) (2023). See also OCGA § 23-2-58 ("Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or

The record shows that Gibson had a managed IRA with PNC, but he converted that account to a self-directed IRA. When establishing that second account, he signed a form expressly designating the new account as a self-directed IRA, specifying that he would direct the investments, and appointing PNC as the custodian of his account. Another form he signed gave him the option of designating PNC as the custodian or as the trustee. He chose custodian.

The relationship between Gibson and PNC is governed by an agreement entitled "Traditional Individual Retirement Account Custodial Agreement and Disclosure Statement." The agreement includes a paragraph specifying the custodian's duties. It provides that the custodian will:

> (a) Receive the proceeds from any assets which are sold and collect amounts due upon any assets which mature or which the Custodian determines are being called or redeemed when timely notice thereof appears in services listing such matters which are widely utilized in national financial markets. . . .

---

where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners; principal and agent; guardian or conservator and minor or ward; personal representative or temporary administrator and heir, legatee, devisee, or beneficiary; trustee and beneficiary; and similar fiduciary relationships.") Case law preceding *King* often used the terms "confidential" and "fiduciary" interchangeably. See, e.g., *Canales*, supra, 261 Ga. App. at 529.

(b) Account for all income with respect to assets.

(c) Keep records of all transactions in such account.

(d) Vote all proxies in accordance with the proxy policy in effect from time to time for the Custodian unless otherwise specifically instructed by Depositor. . . .

(e) Make and deliver all declarations and certificates of ownership required in connection with the account.

(f) Round out, sell or reinvest fractional shares of assets in the Custodian's discretion.

The agreement includes another paragraph expressly limiting the custodian's duties, providing that "[t]he [c]ustodian shall be responsible solely for the performance of those duties expressly assigned to it in the [c]ustodial [a]greement or by operation of law. *The parties do not intend to confer any duties on the [c]ustodian and none shall be inferred, except to the extent so specified. . . .*" (Emphasis added).

This undisputed evidence shows that PNC disclaimed any duties besides the ministerial duties outlined in the agreement; that Gibson made all the investment decisions for his account; and that PNC provided no investment advice. "The custody

agreement and the [undisputed] facts . . . establish an arm's length bargain imposing limited obligations on the parties, not a relationship of trust and confidence or special circumstances as required to make out a fiduciary duty claim." *Lamm v. State Street Bank & Trust*, 749 F3d 938, 951 (IV) (C) (11th Cir. 2014) (punctuation omitted) (applying Florida law and finding that, as a matter of law, based on the parties' agreement and the alleged facts, custodian of self-directed IRA did not owe fiduciary duties to customer). See also *Curry v. TD Ameritrade*, 1:14-CV-1361-LMM, 2015 U.S. Dist. LEXIS 191684, 2015 WL 11251449, at *11-*12 (III) (B) (1) (ND Ga. June 30, 2015) (applying Georgia law and holding as a matter of law that broker-dealer custodian of nondiscretionary IRA, who did not advise plaintiffs about investment decisions, had no fiduciary relationship with plaintiffs).

Gibson argues that PNC was not simply a custodian of his self-directed IRA but was also a fiduciary and trustee. He argues that the parties' agreement did not limit PNC's fiduciary duties, which co-existed with its duties as a custodian. He notes that his account was maintained in PNC's trust division, not its brokerage division; that his account statements from PNC describe the account as a "trust account;" that he

was charged "trust account fees;" and that one form referred to "co fiduciary approvals".

However, the existence of a fiduciary duty "is determined by the substantive agreement of the parties[, ] not . . . by labels placed on the relationship." *SFM Holdings v. Banc of America Securities*, 600 F3d 1334, 1339 (III) (B) (11th Cir. 2010). See also *Washington Road Properties v. Home Ins. Co.*, 145 Ga. App. 782, 784 (2) (245 SE2d 15) (1978) ("[M]ere labels are not necessarily determinative of legal relationships, even as between parties to the contract."). And, as detailed above, the parties' agreement demonstrates that PNC had only limited, ministerial duties. "[Gibson] cite[s] no evidence that [PNC] exercised a controlling influence over [his] will, conduct, or interests. Nor did [he] establish that [he] relied upon [PNC] to make decisions on [his] behalf." *Newitt v. First Union Nat. Bank*, 270 Ga. App. 538, 546 (4) (607 SE2d 188) (2004) (finding no fiduciary relationship as a matter of law based on language of parties' contract and the fact that the transaction was to further each party's own separate business objectives).

Gibson also argues that the person who effected his securities transaction must have been a fiduciary: he was not a registered broker and therefore must have executed

the transaction in reliance on the SEC's "trust and fiduciary" exception to the requirement of such registration. See 15 USC § 78c (a) (4) (B) (ii) ("A bank shall not be considered to be a broker [if t]he bank effects transactions in a trustee capacity, or effects transactions in a fiduciary capacity in its trust department. . . ."). But there is also an IRA-custodian exception to the broker-registration requirement. 15 USC § 78c (a) (4) (B) (viii) (I) (ee) ("A bank shall not be considered to be a broker [if the bank] serves as a custodian or provider of other related administrative services to any individual retirement account. . . ."). See also 17 CFR § 247.760 (a) ("A bank is exempt from the definition of the term 'broker' . . . to the extent that, as part of its customary banking activities, the bank accepts orders to effect transactions in securities for . . . an individual retirement account . . . ."). So the fact that the person who effected Gibson's securities transaction was not a registered broker does not mean that PNC was a fiduciary.

Gibson argues that PNC waived any attorney-client privilege because it did not move for a protective order. He cites no authority supporting his argument that a party waives the attorney-client privilege if it fails to file a motion for a protective order, and we have found none.

Gibson also argues that certain SEC rules and regulations required PNC, as a directed trustee, to comply with fiduciary principles and standards. But as detailed above, PNC was a custodian, not a trustee.

For these reasons, in Case No. A24A0280, we affirm the grant of PNC's anti-SLAPP motion. In Case No. A24A0268, we reverse the denial of PNC's claim for OCGA § 9-11-11.1 (b.1) attorney fees and we reverse the order directing PNC to produce certain documents under a fiduciary duty exception to the attorney-client privilege.

*Judgment in Case No. A24A0280 affirmed. Judgment in Case No. A24A0268 reversed, and case remanded with direction. Mercier, C. J., and Rickman, J., concur.*